[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**MARCH 27, 2003**
**THOMAS K. KAHN**
**CLERK**

No. 01-12416

D.C. Docket No. 99-00258-CR-l-1-JOF

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HOWARD WILLIAM HARRISTON, III,
a.k.a. Little Bill, a.k.a. Little Geek,
a.k.a. Young Gun, a.k.a. Melvin Johnson,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Northern District of Georgia

_____

**(March 27, 2003)**

Before HULL, FAY and GIBSON[*], Circuit Judges.

_____

*Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

PER CURIAM:

Howard William Harriston, III appeals his conviction of racketeering conspiracy in violation of 18 U.S.C. § 1962(d) and of conspiracy to distribute cocaine and marijuana in violation of 21 U.S.C. § 841 and § 846. The district court sentenced Harriston to twenty years on each count to run consecutively for a total sentence of forty years. On appeal, he points to a number of errors in both his conviction and sentencing. Harriston argues first, that the racketeering and drug conspiracies had been abandoned by May 25, 1994, and were therefore barred by the statute of limitations; second, that his racketeering conspiracy conviction was unsupported by two predicate acts, and hence, did not meet the proof requirements of the indictment; third, that the court erred by granting a "partial mistrial," in which it removed two of the racketeering acts alleged in the indictment, but left all four counts in the indictment; fourth, that the district court erred in criticizing defense counsel and the evidence in front of the jury; fifth, that the court erred by allowing government witness Eugene Daniels to testify against him despite the fact that Daniels invoked his Fifth Amendment privilege and refused to answer questions about the Brantley murder; and sixth, that the district court erred in its refusal to strike a prejudicial, unsupported alias from the indictment. In addition,

2

Harriston raises several other arguments relating to his conviction and sentencing which we need not reach. We reverse the conviction and remand for a new trial.

Harriston's prosecution was based on his participation in a criminal enterprise led by Eugene Daniels and Maximillian Wade, both of whom were distributing drugs out of Atlanta. Daniels had come to Atlanta from Los Angeles in October 1991, and in 1992, he incorporated Tommy Gunn productions, a music business which he used to launder the profits of the drug enterprise. That same year, Daniels offered the teen-aged Harriston an opportunity to move to Atlanta from Los Angeles to work with Daniels and live at his townhouse. Over the next few years, Harriston remained in Atlanta with Daniels, staying with him on and off. Meanwhile, Daniels and Wade used a network of thirteen or fourteen individuals to buy drugs from a supplier in Los Angeles and sell cocaine to distributors in cities throughout the southeastern United States, including Atlanta, Birmingham, Louisville, and Memphis.

On November 20, 1992, Daniels, Harriston, and Edwin Nelson, Daniels' brother-in-law and associate, went to Damonne Brantley's apartment in Smyrna, Georgia, for the purpose of collecting money from Brantley, who had taken a kilogram of cocaine Daniels had provided on consignment. When they arrived at the apartment, they encountered Damonne's brother, Aaron Brantley. Aaron

3

Brantley was then bound with duct tape and a coat hanger, stabbed numerous times with a small knife, and shot to death. The group ransacked Damonne's bedroom and took approximately $10,000 to $15,000 in cash that they found there.

The following year, on December 16, 1993, there was a gun fight at Daniels and Wade's apartment on Piedmont Road, in which Wade was shot several times. When the police arrived and entered the apartment to search for suspects, they discovered a large amount of cocaine and marijuana as well as drug records and $80,000 in cash.

Between December 1993 and May 1994, several of Daniels and Wade's drug couriers traveled on some twenty occasions between Los Angeles and Atlanta. On each trip, the courier carried five to ten kilograms of cocaine and/or money. Around this same time, Sophia Willis, a friend of Wade's, arranged for Wade to sell two to three kilograms to of cocaine to Willis' next-door neighbor, Mr. Patterson. They agreed to meet on May 26, 1994 at the Renaissance Hotel in Atlanta. Patterson and another man, who was actually an undercover agent, picked up Willis to take her to the hotel. Willis spoke with Wade by telephone, and at his direction, counted the money Patterson had brought to purchase the cocaine. Willis then paged Wade, and both he and Daniels came to the hotel. Once in the hotel room, Wade removed two kilograms of cocaine from the

4

backpack he was carrying. Task force agents then rushed into the room to arrest all involved. A gunfight erupted in which Wade was shot twice. He was rushed to the emergency room and later died in surgery.

Following the shoot-out at the Renaissance Hotel, Daniels was among those arrested. Even after he was incarcerated, Daniels admittedly continued to conduct drug transactions with other members of the enterprise who remained at large in order to make money. While in the penitentiary, Daniels instructed Harriston to collect money owed to Daniels from drug customers and distributors. Harriston then delivered a bag with $100,000 in cash to Andrea Walden. On May 27, 1994, Andrea Walden picked up Gabrielle Garcia, one of the couriers from Los Angeles, at the airport in Atlanta and gave her the bag containing the money. And on May 28, 1994, Garcia delivered the money to Daniels' Los Angeles supplier, Javier Chacon.

Harriston was tried along with two co-defendants, Carl Lee Clay and Eric Wayne Stewart. The trial consumed fourteen days, in which some forty-five witnesses testified. The jury acquitted Clay and Stewart on all counts, but found Harriston guilty on two of four counts, racketeering conspiracy and drug conspiracy.

What we have outlined above is sufficient to examine the specific arguments that we must consider in this appeal.

I.

A.

Harriston first argues that the district court erred in not applying a five-year statute of limitations to the racketeering and drug conspiracy offenses. Since the indictment in this case was filed on May 26, 1999, the government had the burden to provide evidence that the conspiracies occurred within the previous five years (i.e. on or after May 26, 1994). 18 U.S.C. § 3282 (2000). If the alleged conspiracies were abandoned before this date, then the indictment filed against Harriston would not have been timely. Harriston claims that both conspiracies were abandoned in December 1993 after Wade was shot outside the apartment on Piedmont Avenue.[1]

We review de novo the district court's interpretation and application of the statute of limitations. United States v. Gilbert, 136 F.3d 1451, 1453 (11th Cir. 1998). Although the RICO statute itself contains no time limit provision for

_____

[1]Harriston argues that the criminal enterprise led by Wade and Daniels disbanded in late 1993 or early 1994 based on the following facts: Harriston moved out of Daniels' house and returned to California for a month; two other associates moved back to Los Angeles, and Wade and Daniels moved to another house, a location which was not directly implicated in any drug transactions.

criminal prosecutions of racketeering conspiracies, we have applied the general five-year statute of limitations contained in 18 U.S.C. § 3282. United States v. Starrett, 55 F.3d 1525, 1544 (11th Cir. 1995). Likewise, the limitations period for the drug conspiracy charge is five years. See United States v. Reed, 980 F.2d 1568, 1583 (11th Cir. 1993).

The government is not required to prove an overt act for either a drug conspiracy under 18 U.S.C. § 846 or a RICO conspiracy under 21 U.S.C. §1962(d). See United States v. Terzado-Madruga, 897 F.2d 1099, 1121 (11th Cir. 1990) (drug conspiracy); United States v. Coia, 719 F.2d 1120, 1124 (11th Cir. 1983) (RICO conspiracy). The government satisfies the requirements of the statute of limitations for a non-overt act conspiracy if it alleges and proves that the conspiracy continued into the limitations period. United States v. Arnold, 117 F.3d 1308, 1313 (11th Cir. 1997). The government only has to show, either directly or circumstantially, that a conspiracy existed; that the defendant knew of the conspiracy; and that with knowledge, the defendant became a part of the conspiracy. Id. A conspiracy is deemed to have continued as long as the purposes of the conspiracy have neither been abandoned nor accomplished and the defendant has not made an affirmative showing that the conspiracy has terminated. United States v. Gonzalez, 921 F.2d 1530, 1548 (11th Cir. 1991) (citing Coia, 719

7

F.2d at 1124). A defendant can overcome this presumption of continued participation only by showing that he affirmatively withdrew from the conspiracy or that the final act in furtherance of the conspiracy has occurred. Reed, 980 F.2d at 1584.

Harriston has failed to make such a showing in this case. He and his co-conspirators did not abandon the purpose of the conspiracy; Harriston did not affirmatively withdraw; and the final act in furtherance of the conspiracy did not occur before May 26, 1994.

First, Harriston argues that the conspiracy had essentially ended after Wade was shot in December 1993 to the extent that there was no longer an intact group of co-conspirators. The record suggests otherwise. The goal of the conspiracies was to obtain money for the enterprise by distributing drugs throughout Atlanta and the southeastern United States, and this purpose continued well beyond the December 1993 shooting. The government presented evidence that on May 26, 1994, Wade and Daniels participated in the drug transaction at the Renaissance Hotel, in which they attempted to sell several kilograms of cocaine to government agents. After Wade's death and Daniels' arrest, on May 27, 1994, Garcia flew to Atlanta, was picked up at the airport by Andrea Walden, and was given a bag full of money which had been retrieved from Daniels' house. On May 28, 1994,

Garcia returned to Los Angeles and delivered this money to Javier Chacon, Daniels' drug supplier in California. Derrick Williams testified that sometime after Wade's funeral, he learned from Daniels that Aliyah Fard had a kilogram of cocaine. Williams went over to Fard's house, picked up the cocaine, sold it, and gave some of the proceeds to Roderick Bullock to pass on to Daniels' wife. The actions of Wade, Daniels, Garcia, Walden, Chacon, Williams, Fard, and Bullock indicate that a core group of co-conspirators remained intact, that the purpose of the conspiracies remained substantially the same, and that these conspiracies continued on until May 26, 1994 and afterwards.

Second, Harriston contends that his decision in February 1994 to live with his girlfriend, rather than with Daniels, and his lack of participation in the Renaissance Hotel drug transaction on May 26, 1994 implicitly show that he withdrew from the conspiracy before that date. However, a defendant must "affirmatively withdraw" from the conspiracy and not just distance himself from the participants. Reed, 980 F.2d at 1584. In any case, Harriston did not distance himself from his co-conspirators. There was testimony from several witnesses that even after May 26, 1994, Harriston took actions in furtherance of the conspiracies. The government presented evidence that sometime around May 27 or May 28,

9

1994,[2] Harriston went to Daniels' house, picked up a bag full of money, and delivered it to Andrea Walden; that in June 1994, Harriston attempted to collect drug money that was owed to Daniels; and that a few months later, Harriston sold nine ounces of cocaine to Lyndon Baines Williams.

Finally, Harriston asserts that his role in collecting money after May 26, 1994 was for Daniels' legal defense and not part of the drug and racketeering conspiracies. He claims that if anything, these acts constituted a separate "legal defense fund" conspiracy. In deciding whether or not the evidence at trial supports the conclusion that a new conspiracy existed, we look at (1) whether the new conspiracy shared a common goal with the previous conspiracies, (2) whether the nature of the scheme underlying the crimes remained the same, and (3) whether the participants overlapped. Reed, 980 F.2d at 1582. Since Harriston and others were attempting to collect money for drugs Daniels had previously provided on consignment and to deliver money Daniels owed to suppliers, the goal of their actions (obtaining money for the enterprise through drug sales) and the scheme underlying the crimes charged (purchase of drugs from Los Angeles to be distributed in the Southeast) were primarily the same. Likewise, the co-

---

[2]While Walden did not testify as to the exact date that Harriston retrieved the bag of money, she stated that she rented a car for Harriston on May 25th and that he went and picked up the money a few days later (which would put Harriston's delivery sometime after May 26, 1994).

conspirators he worked with (Walden, Garcia, Chacon, Williams, Bullock, Fard) were all part of the drug and racketeering conspiracies. Even though some of the money collected might have been used for Daniels' legal defense, a reasonable jury could find that the efforts to collect money for Daniels after May 26, 1994 were part of the same racketeering and drug conspiracies as detailed in the indictment.

We conclude that the district court properly denied Harriston's motion for acquittal on statute of limitations grounds.

### B.

Second, Harriston argues that the district court erred in not granting his motion for acquittal after the jury found him guilty of racketeering conspiracy but not guilty of the substantive RICO offense. He argues that in order to convict him of racketeering conspiracy, the jury had to find him guilty of agreeing to commit two predicate acts. He claims that the district court's allowance of a conspiracy charge without proof of his agreement to two predicate acts constituted a constructive amendment to the indictment, broadening the bases for conviction under the indictment and creating a per-se reversible error.

The Supreme Court has made clear that the conspiracy offense of 18 U.S.C. § 1962(d) has lesser proof requirements than the substantive RICO offense under § 1962(c). "The RICO conspiracy statute, § 1962(d), broadened conspiracy

11

coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove each conspirator agreed that he would be the one to commit two predicate acts." Salinas v. United States, 522 U.S. 52, 64 (1997). Rather, the government can show an agreement to participate in a RICO conspiracy in one of two ways: (1) by providing evidence that the defendant agreed to commit two predicate acts, *or* (2) by providing evidence that the defendant agreed to the overall objective of the conspiracy. United States v. Abbell, 271 F.3d 1286, 1299 (11th Cir. 2001), cert. denied, 123 S.Ct. 74 (2002). "If the government can prove an agreement on an overall objective, it need not prove a defendant personally agreed to commit two predicate acts." Id. And regardless of how the government proves the agreement to the overall objective, it does not necessarily have to show that the defendant explicitly agreed with his co-conspirators to commit the substantive RICO crimes as described in the indictment. United States v. To, 144 F.3d 737, 744 (11th Cir. 1998).

Count II of the indictment charged Harriston with participating in a RICO conspiracy.[3] The overall objective of the enterprise, as stated in the indictment

---

[3]Count I of Harriston's indictment charged him with racketeering and included the following predicate acts: (1) the Atlanta-based drug conspiracy, (2) the kidnaping and armed robbery of Aaron Brantley, (3) the murder of Aaron Brantley, and (4) the Piedmont Road drug seizure. In Count II,

12

was (1) "to obtain money for the members and associates of the enterprise," (2) "to organize a plan and scheme to enrich the defendants . . . by committing narcotics offenses," and (3) "to preserve and protect the power, territory, and the money-making endeavors of the enterprise."

The government presented sufficient circumstantial evidence that Harriston agreed to all three of these objectives. Several witnesses testified regarding Harriston's efforts to obtain money for the enterprise. Desean Grice testified that he had owed Eugene Daniels $12,000 for cocaine purchases and that Harriston visited Grice in Birmingham, Alabama in June 1994 and tried to collect this money. Andrea Walden testified that in May 1994, Eugene Daniels contacted her from jail and told her to page Harriston and have Harriston go by Daniels' house and pick up a bag. Harriston picked up the bag and then brought it to her; she later discovered the bag was full of money.

The government also provided evidence that Harriston was involved in committing narcotics offenses. Lyndon Baines Williams testified that he regularly engaged in cocaine transactions with Daniels and Wade, the leaders of the

_____

the government charged Harriston with participating in a racketeering conspiracy. The indictment stated that Harriston "did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree together, and with co-racketeers" to violate 18 U.S.C. § 1962(c) and "did agree to conduct and participate, directly and indirectly, in the conduct of the affairs of such enterprise through a pattern of racketeering activity, consisting of the racketeering acts set out in Section E of Count One [the above-mentioned predicate acts]."

13

enterprise, and that a few months after the May 26th arrest of Daniels, he met with Harriston and paid him $5,500 for nine ounces of cocaine. Desean Grice also testified that Harriston was a drug "carrier" for Daniels and Wade.

Finally, several witnesses provided evidence of Harriston's commitment to preserving and protecting the territory, power, and money-making endeavors of the racketeering enterprise. Derrick Williams testified that Harriston and Edwin Nelson agreed to go with Daniels to collect money from a residence at Camden Crest. Williams stated that he observed Daniels, Harriston, and Nelson drive off together and that Harriston was carrying a long barrel, 357 magnum revolver at the time. Nelson testified that Daniels had asked him and Harriston to help Daniels collect money and that he and Harriston both accompanied Daniels to collect this money. Gabrielle Garcia stated that Harriston later told her that he "jacked somebody and he smoked them" which she understood to mean "he robbed somebody and he killed them." We conclude that the government provided sufficient evidence of Harriston's agreement to the overall objective of the RICO enterprise as stated in the indictment.

II.

A.

14

Harriston argues that the district court should have granted a mistrial because the prosecutor elicited inadmissible testimony relating to Harriston's prior murder conviction in California. Harriston's counsel objected to the testimony and promptly moved for a mistrial on the entire indictment.

Although recognizing the highly prejudicial nature of this inadmissible testimony, the district court denied Harriston's motion for a mistrial as to all four counts in the indictment. Instead, the district court granted only a "partial mistrial" on two of the four predicate acts listed under the substantive RICO offense, removed the two predicate acts from the indictment, and gave the jury curative instructions.

This case is quite unusual as the district court actually recognized that serious prejudice had occurred and granted a partial mistrial. During the cross-examination of Los Angeles Police Officer Darren Dupree, the prosecution asked a series of questions which exposed that Harriston had pled guilty to a murder in California. At that very moment, the district court *sua sponte* asked the jury to step out of the courtroom and told the prosecution: "[t]here are some explanations for events that simply can't be made in front of a jury and you have put before this jury a conviction for a homicide of a defendant on trial where one of the

15

allegations is murder." Both sides agreed that the remarks had been wholly

improper.[4]

The district court reprimanded the prosecutor, stating that in "30 years" the

court "had never seen a more ill-advised move." The district court then advised

defense counsel "don't ask for it [a mistrial] unless you want it," as follows:

> Mr. HOWARD [defense counsel]: Well, I don't think I have any
> choice but to move for a mistrial.
> THE COURT: Don't ask for it unless you want it. I'm not promising
> you you will get it but I'm telling you, don't ask for it unless you
> want it.
> MR. HOWARD: I understand. I should probably talk with my client,
> because I've been in this situation before and have had it granted
> when, perhaps, it wasn't the best alternative.
>
> * * *
>
> THE COURT: Mr. Langway[prosecutor], all that I'm capable of
> saying at the moment is that there are some explanations for events
> that simply can't be made in front of a jury and you have put before
> this jury a conviction for a homicide of a defendant on trial where one
> of the allegations is murder.

---

[4]We are not reviewing whether the district court abused its discretion in admitting the prior conviction, as the parties agree the prior murder conviction was not admissible. Instead, we are reviewing whether the district court properly denied defendant Harriston's motion for a mistrial. "The decision of whether to grant a mistrial lies within the sound discretion of a trial judge as he or she is in the best position to evaluate the prejudicial effect of improper testimony." United States v. Perez, 30 F.3d 1407, 1410 (11th Cir. 1994); see United States v. Holmes, 767 F.2d 820, 823 (11th. Cir. 1985) (quoting United States v. Satterfield, 743 F.2d 827, 848 (11th Cir. 1984). "We will not reverse a district court's refusal to grant a mistrial unless an abuse of discretion has occurred." United States v. Perez, 30 F.3d at 1410; United States v. Christopher, 923 F.2d 1545, 1554 (11th Cir. 1991). When a curative instruction has been given to address some improper and prejudicial evidence, we will reverse only if the evidence "is so highly prejudicial as to be incurable by the trial court's admonition." United States v. Funt, 896 F.2d 1288, 1295 (11th Cir. 1990) (quoting United States v. Tenorio-Angel, 756 F.2d 1505, 1512 (11th Cir. 1985)).

16

In all of my life in the criminal justice system, 30 years, I have never seen a more ill-advised move.

MR. LANGWAY: Can I just state the other reason? This officer testified –

THE COURT: There ain't no good reason, Mr. Langway, there is none. No, no.

MR. LANGWAY: I apologize to the Court.

THE COURT: That ain't good enough, Counsel. I'm afraid that you have wasted two weeks of the Court's and jury's time.

After this colloquy, Harriston's counsel made a motion for a mistrial on the entire indictment; the prosecution asked for curative instructions and/or an individual voir dire of the jury. Although the court appeared inclined to grant the mistrial, the court gave the defendants the weekend to think about whether they actually wanted a mistrial. The court completed the testimony of the offending government witness and recessed the trial for the weekend.

When the trial reconvened the following Tuesday, Harriston's counsel requested a mistrial, but the district court ultimately decided to deny Harriston's motion for a mistrial of the entire case. The court granted a partial mistrial as to two predicate acts and removed only predicate acts 2 and 3 (which included the kidnaping, armed robbery, and murder of Aaron Brantley) from the RICO substantive offense, but left all four indictment counts against Harriston otherwise untouched. In justifying its mistrial decision, the court explained that the prosecution's evidence was very weak on the predicate acts of kidnaping, armed

17

robbery, and murder in the RICO substantive offense, and that there was a "great likelihood" that the jury would get out of the prejudicial remarks that Harriston had murdered someone else, evidence which could "tilt the balance in a weak case." However, the district court retained the predicate acts involving drugs on the RICO substantive offense because it found that the prosecution had presented substantial evidence on these charges that was not affected by the improper remarks.

The jury already had been given a copy of the indictment with the predicate acts of kidnaping, armed robbery, and murder. The district court thus had to give the jury a revised copy of the indictment with two of the racketeering acts removed and had to instruct the jury to disregard any evidence the prosecution elicited from Officer Dupree at the end of the cross-examination.

The jury ultimately acquitted Harriston's co-defendants on all counts. The jury also acquitted Harriston on the substantive RICO and drug distribution counts. The jury, however, convicted Harriston on the drug conspiracy and RICO conspiracy counts.

After considerable review, we conclude that the inadmissible testimony about Harriston's murder conviction not only was unfairly prejudicial to Harriston on the two predicate racketeering acts, but also was unfairly prejudicial to

18

Harriston on the RICO conspiracy and drug conspiracy counts as well. We reach this conclusion for several reasons.

First, the RICO conspiracy and drug conspiracy in this case involved schemes whereby significant amounts of drugs repeatedly were transported by various couriers from Los Angeles, California to Atlanta, Georgia and then distributed throughout the southeastern United States. Drug proceeds, including large amounts of currency totaling in excess of $1 million, in turn were transported by couriers back to California. Various drug suppliers were on the west coast, including California. The California connection was an integral part of the RICO conspiracy and drug conspiracy of which Harriston was convicted. That Harriston was convicted of murder in California was as equally prejudicial to these RICO and drug conspiracy counts as to the two stricken predicate acts in the substantive RICO count.

Second, the inadmissible prior California murder conviction was not tied in a particular factual manner, or any particularized way, to the predicate acts involving the armed robbery, kidnaping and murder of Aaron Brantley. If anything, the jury heard evidence of similar violence taking place during the course of the RICO conspiracy and drug conspiracy of which Harriston was convicted. Moreover, as already pointed out, the RICO conspiracy and drug

19

conspiracy were tied directly to California; whereas, the Aaron Brantley murder occurred in Georgia. Again, there was no factual or reasonable basis to conclude that the inadmissible evidence of the California murder conviction warranted a mistrial on the predicate acts but not on the entire indictment.

Even though the prejudicial effect on the other charges in the indictment was equal to that of the predicate acts, we still must determine whether the prejudicial effect of the inadmissible California murder conviction was sufficient to require a mistrial of the case. Despite the prejudice inherent in the erroneous use of a prior conviction, the introduction of such evidence is not deemed per se justification for a mistrial or reversal of a conviction. If the admission of the prior conviction was harmless, we will not disturb Harriston's instant convictions. See, e.g., United States v. Jones, 28 F.3d 1574, 1582 (11th Cir. 1994), modified on other grounds, 74 F.3d 275 (11th Cir. 1996); United States v. Hosford, 782 F.2d 936, 939-40 (11th Cir. 1986); United States v. Fortenberry, 971 F.2d 717, 722 (11th Cir. 1992); United States v. Eason, 920 F.2d 731, 735 (11th. Cir. 1990). We often have concluded that an error in admitting evidence of a prior conviction was harmless where there is overwhelming evidence of guilt. E.g., Jones, 28 F.3d at 1582; Hosford, 782 F.2d at 939; Fortenberry, 971 F.2d at 722. This Court further has instructed that "erroneous admission of evidence does not warrant reversal if

the error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." Jones, 28 F.3d at 1582; Fortenberry, 971 F.2d at 722. These harmless-error determinations are highly fact-intensive and will vary from case to case.

Given the seriousness of the type of prior conviction in issue, the California connection between the inadmissible prior murder conviction and the charges on trial, and the nature of the evidence against Harriston, we believe that the prior California murder conviction substantially influenced the jury. While there was sufficient evidence to sustain Harriston's convictions, we cannot say the evidence was so overwhelming on the RICO conspiracy and drug conspiracy counts to make this error harmless. Indeed, the co-defendants were all found not guilty, and Harriston was acquitted on two of the four counts. Given the factual circumstances, we also cannot say the jury likely disregarded the prior California murder conviction, especially when testified to by a police detective from Los Angeles, California, or that this inadmissible conviction had only a very slight effect on the jury's determination.

While we recognize the district court's understandable attempt to cure the prejudice problem in a way that did not mistry the entire case, the district court's initial reactions that the eliciting of the inadmissible prior California murder

conviction was highly prejudicial, ill-advised, and merited a mistrial were well-founded. The inadmissible California murder conviction not only warranted a mistrial on the predicate acts as the district court properly found, but it also warranted a mistrial of the entire indictment under the particular factual circumstances of this case. The district court's initial judgment—"don't ask for it [a mistrial] unless you want it"—was the correct one. We conclude the admitted highly prejudicial error here was not harmless and that the district court abused its discretion in denying the motion for a mistrial. Thus, we vacate Harriston's conviction and sentence on the RICO conspiracy and drug conspiracy counts and remand for a new trial.

B.

Harriston also argues that he was prejudiced by the district court's reprimand of defense counsel after the court interpreted counsel's questioning of the witness as implying that the prosecutor fabricated evidence. The court directed defense counsel to either apologize to the prosecutor or provide evidence for the accusation. Harriston claims that the court's remarks deprived him of his right to a fair trial.

A trial judge is not limited to giving abstract instructions to the jury; he may assist the jury by commenting on the evidence or by drawing attention to parts of

22

the evidence that he thinks are important. United States v. Jenkins, 901 F.2d 1075, 1082 (11th Cir. 1990). At the same time, the judge must instruct the jury that it remains the sole fact finder and that it is not bound by his comments on the evidence. United States v. Hope, 714 F.2d 1084, 1088 (11th Cir. 1983). Neutrality by the judge is important because "[j]uries are extremely sensitive to every word and intimation given by the judge." United States v. Cox, 664 F.2d 257, 259 (11th Cir. 1981). "Only when the judge's conduct strays from neutrality is the defendant thereby denied a constitutionally fair trial." United States v. Harris, 720 F.2d 1259, 1262 (11th Cir. 1983) (quoting Moore v. United States, 598 F.2d 439, 442 (5th Cir. 1979)).

The exchange between Harriston's counsel, the prosecutor, and the district judge during the cross-examination of Officer Smith went as follows:

Q. So it is it fair to say then that you always remembered this conversation with Mr. Harriston but last week is the first time that you saw fit to share it with anyone pertaining to the prosecution of this case?
A. It was the first time anybody ever asked me.
Q. And the person who asked you and the person who you remembered it for was Mr. Langway, correct?
    MR. LANGWAY [Assistant U.S. Attorney]: Objection, your Honor.
    THE COURT: Overruled.
    MR. LANGWAY: It's a scandalous comment, and the court directed counsel not to say anything.
    THE COURT: *You didn't mean to suggest, did you, that Mr. Langway invented the testimony and told it to the witness? You didn't mean to suggest that, did you?*

23

MR. HOWARD [Harriston's counsel]: All I mean to do --

THE COURT: *Counsel, did you mean to suggest that?*

MR. HOWARD: I'm not suggesting anything.  I'm asking questions.

THE COURT: *You can suggest whatever you wish to suggest that's supported by the facts as to the witness.  I simply want to know if you intended by that comment to infer that the prosecutor is the architect of the evidence?  I want to know if that is your accusation.*

MR. HOWARD: I have accused nobody of anything.  I've only asked questions.

THE COURT: *You either apologize to the prosecutor and state that you had no intention of making that or I will excuse the jury and we will have a hearing right now to see if you have any basis in fact to make an accusation against an officer of the court, an officer of the United States.  Those are your choices.*

MR. HOWARD: I have no further questions. (emphasis added).

Harriston has argued that the judge's remarks "unfairly bolstered the Government's witness, negated the impeachment of Officer Smith, and disparaged the integrity and credibility of Harriston's defense counsel in the presence of the jury."  Harriston's counsel was pursuing a line of questioning directed at whether Officer Smith was truthful in telling Assistant U.S. Attorney Langway about a conversation Smith had with Harriston concerning a drug deal in Atlanta.  The court understood one of these questions to imply that Langway encouraged Smith to lie.  The judge's reprimand of defense counsel cut short this line of questioning.  However, after Langway conducted redirect examination of Smith, the court encouraged Harriston's counsel to recross-examine Officer Smith.  The court allowed Harriston's counsel to question Officer Smith about when Smith first met

24

with Langway, what information Smith received from Langway, how Smith learned about the drug charges, whether Smith knew about Langway's lack of evidence on these charges, and why Smith did not recall his conversation with Harriston the first time he spoke with Langway. The court overruled all of the scope and relevance objections made by the government throughout Harriston's recross-examination. The court's willingness to permit extensive recross-examination after its reprimand of defense counsel leads us to believe that the court did not unfairly bolster the government's witness or negate the impeachment of Officer Smith.

At the same time, the court's insistence on having the defense attorney apologize to the prosecution did disparage the credibility and integrity of defense counsel. The disputed question was not so severe as to require the public disciplining of Harriston's attorney. The implication that Langway told Officer Smith to lie was a questionable inference; the court did not even recognize it at first and overruled the government's objection. Only after Langway said, "[i]t's a scandalous comment, and the court directed counsel not to say anything," did the court intercede. Any concern that the judge had over this comment could have been expressed to defense counsel in a bench conference. The court's demand that defense counsel apologize in front of the jury was demeaning and did nothing to

25

correct the impression that the government was encouraging the witness to lie.[5] If anything, the court's questions, asking whether counsel was suggesting that "Langway invented the testimony and told the witness" or that "the prosecutor [was] the architect of this evidence," brought further unnecessary attention to this inference. Had the court determined that corrective measures were necessary, it should have addressed the jury directly.

In the end, while the court's remarks were unnecessary and improper, they do not require reversal. See, e.g., Harris, 720 F.2d at 1262.[6] The comments by the court were aimed at what it perceived to be an implicit attack on the Assistant U.S. Attorney and not at bolstering the credibility of the witness. Although the remarks to defense counsel were harsh, the court allowed Harriston's counsel a full opportunity to impeach the witness on recross-examination. The court's response to defense counsel was in the context of a two and a half week trial in which the

---

[5] After the jury was dismissed, the court again asked defense counsel for proof of this accusation against the Assistant U.S. Attorney and threatened to hold defense counsel responsible for his comment if defense counsel did not apologize directly on the record.

[6] In Harris, we stated that although the trial judge was warranted in correcting the statement made by defense counsel, the "manner and content" was "unnecessary and improper" largely because "[t]he blunt reprimand in the jury's presence served more to embarrass the attorney than to correct his impropriety." 720 F.2d at 1262. We concluded that the questionable judicial conduct did not constitute reversible error because the judge's remarks did not vouch for the credibility of the witness, the judge distinguished the actions of defense counsel from the question of guilt, and the judge's comments had to be evaluated in the context of the entire trial. Id.

26

court was critical of both defense counsel and the government at different times. We trust that this situation will not recur on retrial.

### III. Aliases

Harriston also argues that the district court's refusal to strike the unsupported and prejudicial aliases from the indictment constitutes reversible error.

"If the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment, the inclusion of the alias in the indictment is both relevant and permissible, and a pretrial motion to strike should not be granted." United States v. Clark, 541 F.2d 1016, 1018 (4th Cir. 1976). See also United States v. Hines, 955 F.2d 1449,1454 (11th Cir. 1992) ("It is clear . . . [t]he use of an alias in an indictment is permissible if it is necessary to connect the defendants with the acts charged.").

We agree with Harriston that the aliases "Young Gun" and "Little Geek" were not supported by any evidence proffered during the trial. The trial witnesses referred to Harriston as "Little Bill" or "Melvin Johnson," but no witness referred to Harriston as "Young Gun" or "Little Geek," and no witness claimed that Harriston used these aliases in the past. Indeed, even the government referred to

Harriston as "Little Bill" and never used the aliases "Young Gun" or "Little Geek" in its closing argument. Thus, upon proper motion, these unsubstantiated aliases should have been removed at the close of the evidence before the indictment went out with the jury.

Given our reversal on other grounds, we need not resolve, however, whether these unsupported aliases remaining in the indictment affected the defendant's substantial rights.[7]

## IV. Conclusion

Accordingly, we reverse and vacate Harriston's conviction and sentence and remand this case for a new trial consistent with this opinion.

REVERSED, VACATED, and REMANDED.

---

[7]We also need not reach the sentencing issues or Harriston's claim that the district court erred by allowing government witness, Eugene Daniels, to testify against him.