[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12471
Non-Argument Calendar

_____

D.C. Docket No. 3:11-cr-00093-RV-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TERRANCE JAROME JOHNSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(January 16, 2013)

Before TJOFLAT, HULL and PRYOR, Circuit Judges.

PER CURIAM:

After entering a guilty plea, Defendant Terrance Johnson appeals his 97-month sentence on four counts of selling firearms and ammunition to a convicted felon, in violation of 18 U.S.C. §§ 922(d)(1) and 924(a)(2). After review, we

affirm.

## I.  FACTUAL BACKGROUND

In a multi-agency undercover operation, undercover agents and a confidential source operated a fake secondhand thrift store.  Defendant Johnson was charged with, and pled guilty to, four counts of selling firearms and ammunition to a convicted felon at the thrift store.

## A.    Presentence Investigation Report

According to the Presentence Investigation Report ("PSI"), Defendant Johnson made numerous visits to the thrift store.  On many of these occasions, Johnson sold small amounts of marijuana to undercover agents.  On others, Johnson made legal sales of firearms.

However, on the four occasions in the indictment, Johnson sold firearms to the confidential source, who was a convicted felon.  These four firearm sales were the basis for Johnson's charges.  Orlance Sangster, an associate of Johnson, accompanied Johnson during two of the four charged firearm sales.

In addition to the four charged sales by Johnson, the PSI attributed eight other illegal firearm sales made by Sangster as relevant conduct of Johnson.  Specifically, Sangster alone conducted numerous illegal firearm sales at the thrift store, but during some of these sales, Sangster said he was there on behalf of

2

Johnson. At other times, Sangster visited the thrift store and told undercover agents about guns Johnson wanted to sell. During two of Sangster's firearm sales, Johnson waited outside the thrift store. During two other firearm sales, Sangster used his cell phone during negotiations. One of the firearms Sangster sold to the thrift store had the serial number removed. After his arrest, Sangster told agents that he got all the firearms from Johnson and sold them at Johnson's direction.

Based on these facts, the PSI recommended that Johnson receive: (1) a base offense level of 20, pursuant to U.S.S.G. § 2K2.1(a)(4)(B); (2) a four-level increase under U.S.S.G. § 2K2.1(b)(1)(B) because Johnson's offenses involved between 8 and 24 firearms; (3) a four-level increase under U.S.S.G. § 2K2.1(b)(4)(B) because one of the firearms had an obliterated serial number; and (4) a four-level increase under U.S.S.G. § 2K2.1(b)(6)(B) for use or possession of a firearm in connection with another felony offense, namely one of Johnson's sales of marijuana to undercover agents.

In addition, the PSI applied a two-level increase under U.S.S.G. § 3C1.1 for obstruction of justice. The PSI stated that, in a recorded telephone conversation from the jail, Johnson instructed his mother to contact Sangster's mother and tell her that Sangster should not cooperate with the government. Johnson told his mother that if Sangster cooperated he was "DOA." Sangster's mother told

3

investigators that Johnson's mother had made repeated calls to her asking her to tell Sangster not to cooperate with the government and included comments that were not overt threats, but that Sangster's mother perceived as threatening.

The PSI recommended no reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) because Johnson had not pled guilty until the day of trial. Based on a criminal history category of I and a total offense level of 34, the PSI recommended an advisory guidelines range of 151 to 188 months.

## B.    Defendant's Objections

Defendant Johnson objected to, inter alia: (1) the PSI's factual statement that the firearms Sangster had sold were provided by Johnson and sold at his direction; (2) the four-level enhancement based on the number of firearms; and (3) the four-level enhancement for the obliterated serial number.  Johnson contended that: (1) he did not provide Sangster with those firearms; (2) he was not involved in those Sangster sales; and (3) he should be held accountable for only the four firearms charged in his indictment.

Johnson also objected to receiving the four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) for possession or use of a firearm "in connection with" another felony because he possessed the firearm only to sell it to the thrift store and had not sold the marijuana until later that day.  Johnson also objected to the

4

obstruction-of-justice enhancement and to the denial of an acceptance-of-responsibility reduction.

## C.    Sentencing Hearing

At the sentencing hearing, the district court sustained Defendant Johnson's objections to the four-level firearm possession enhancement under U.S.S.G. § 2K2.1(b)(6)(B) and to the denial of a two-level acceptance-of-responsibility reduction.  This reduced the PSI's total offense level by six levels, i.e., from 34 to 28.

The district court, however, overruled Johnson's objection to the two-level obstruction-of-justice enhancement, stating that tampering with a witness was obstruction.  The main issue at the sentencing hearing was whether the relevant conduct of Johnson should include at least four of the firearms Sangster had said were provided by Johnson and sold by Sangster at Johnson's direction.

The government called Sangster as a witness.  Sangster testified that he had entered into a plea agreement, pled guilty to a five-count indictment and was awaiting sentencing.  Sangster stated that he had agreed to cooperate with the government and had met with an agent and the prosecutor at the jail.  Sangster indicated, however, that he had "[j]ust now" changed his mind and was no longer willing to answer any questions about his involvement and would not tell the court

5

how he obtained any firearms.

Sangster was excused, and the government introduced several videotape recordings of firearm sales at the thrift store. One recording showed the firearm sale in Johnson's Count 1, which depicted both Johnson and Sangster participating in the sale. The second recording showed a sale by Sangster alone, which depicted Sangster using a cell phone to communicate with someone prior to completing the sale. The third recording depicted Sangster with Johnson's half-brother discussing a refund for a prior firearm sale. The pair also used a cell phone to communicate with someone prior to completing the refund.

The government then called Escambia County Sheriff's Deputy Jason Gilmore, an undercover agent during the operation, who was involved in firearm transactions with both Defendant Johnson and Sangster. Deputy Gilmore testified that on one occasion, Johnson and Sangster arrived at the location together, but only Sangster entered the thrift store and completed the firearm sale. Deputy Gilmore stated that he believed Johnson and Sangster were working together based on "[t]he communication between the two during different sales." On cross-examination, Deputy Gilmore admitted that he did not know who Sangster was communicating with during his firearm sales and that he had not obtained Sangster's phone records.

6

After Deputy Gilmore finished testifying, the prosecutor stated that he had "[n]o further witnesses." Johnson's counsel then argued that the government had failed to prove that Johnson was involved in Sangster's illegal firearm sales, and thus had failed to prove Johnson's offense involved at least eight firearms or a firearm with an obliterated serial number. In response, the prosecutor stated that he had "talked to Mr. Sangster as late as Friday, and he was on board, he was coming in and going to tell us that the guns that he purchased came from Mr. Johnson. Obviously, over the weekend he had a change of heart."

The following exchange then took place between the district court and the prosecution about the agents Sangster had talked to about the firearms:

> **THE COURT:** Well, he testified -- well, he didn't testify here, but he talked to an agent? Which agent?
> **[PROSECUTOR]:** He talked to Special Agent Saier on another occasion, and he talked to a Special Agent George Bruno from ATF as well.
> **THE COURT:** Do you want to bring in an agent? I mean, you've got the right to do that.
> **[DEFENSE COUNSEL]:** Your Honor, if I -- go ahead.
> **[PROSECUTOR]:** Judge, we can bring in -- we can call the Resident Agent in Charge, Randy Beach, who also talked to Sangster about these firearms.

Johnson's counsel objected "to the Court suggesting that the Government call another witness," stating that it seemed "to the Defense that the Court, in doing so, is no longer a neutral arbiter of the facts." The district court overruled the

7

objection, stating:

> [A]ll of this is set out in the Presentence Report as a factual recitation, including statements from Mr. Sangster, which obviously have a basis in fact somewhere. The Government is entitled to establish that. And we've got a witness who comes in and who is supposed to come in and testify and then says he's not. So the Government is entitled to establish that by other means, so I'm going to give them an opportunity to do it.

After a lunch recess, the government called ATF Special Agent George Bruno, who testified that when he interviewed Sangster, Sangster indicated that Johnson had provided all the firearms Sangster sold at the thrift store. Agent Bruno had viewed all the video recordings with Sangster, and Sangster admitted that each time he was shown bringing a firearm to the thrift store, he was acting as a middleman for Johnson, who coordinated all the sales, including the price. Sangster also stated that when he was shown talking or texting on a cell phone, he was communicating with Johnson.

The district court overruled Johnson's objections to the four-level number-of-firearms and the four-level obliterated-serial-number enhancements, finding that all the firearms Sangster sold to the thrift store were attributable to Johnson as relevant conduct. As a result of the district court's various rulings, the district court calculated a total offense level of 28 and a criminal history category of I, which yielded an advisory guidelines range of 78 to 97 months. The district court

imposed a 97-month sentence.  Defendant Johnson filed this appeal.

## II.  DISCUSSION

On appeal, Johnson raises a single issue.  Johnson argues that the district court breached its duty of impartiality at his sentencing hearing and thereby denied him due process.

A defendant is denied a constitutionally fair trial "[w]hen the judge's conduct strays from neutrality," and the district court "abuses its authority when it abandons its proper role and assumes that of an advocate." United States v. Wright, 392 F.3d 1269, 1274 (11th Cir. 2004) (quotation marks and brackets omitted).  In the context of a jury trial, the judge "must be above even the appearance of being partial to the prosecution." Id. (quoting Moore v. United States, 598 F.2d 439, 442 (5th Cir. 1979)).  This is so "because juries are extremely sensitive to every word and intimation given by the judge." United States v. Harriston, 329 F.3d 779, 790 (11th Cir. 2003) (quotation marks and brackets omitted).

We note that the judicial conduct in question here occurred in the sentencing context, and not before a jury.  Many of the concerns about judicial intervention or inappropriate remarks are greatly diminished or even eliminated when the judicial conduct occurs outside a jury's presence. See United States v.

Hill, 643 F.3d 807, 849 (11th Cir. 2011) (concluding that district court's comments when ruling on evidentiary objections were not prejudicial and "could not have had any effect on the jury because they were made outside its presence), cert. denied, 132 S. Ct. 1988 (2012); United States v. Palma, 511 F.3d 1311, 1317 (11th Cir. 2008) (concluding that district court's negative remarks to defense counsel outside jury's presence did not warrant new trial "[b]ecause a clear effect on the jury is required to reverse for comment by the trial judge" (quotation marks omitted)); United States v. Stewart, 820 F.2d 370, 374 (11th Cir. 1987) (concluding that defendant's due process rights were not violated by trial judge's questioning of defense witnesses because it "occurred while the jury was excused; thus, even if the judge strayed from neutrality while questioning these witnesses, such error was harmless").

Further, under the Federal Rules of Evidence, the district court may not only question witnesses called by the parties, but also may call its own witnesses. See Fed. R. Evid. 614. This Court has recognized that it may be appropriate at times for a judge to do such things as comment on the evidence, question witnesses and elicit facts not yet adduced or clarify those facts already presented. See, e.g., United States v. Day, 405 F.3d 1293, 1297 (11th Cir. 2005); Wright, 392 F.3d at 1275. In Wright, for example, we rejected the argument that district court had

10

"discarded its neutral role" by pointing out that the government's witness had failed to identify the defendant in court and directing the prosecutor to ask the witness to describe the defendant's hand gesture.  Wright, 392 F.3d at 1275.  In Day, we found no abuse of discretion when the district court "suggested to the government the manner in which [a witness's confusing testimony] might be clarified."  Day, 405 F.3d at 1297.  We have said that "[t]he trial court abuses its discretion only when the judge's conduct strays from neutrality, and even then only when its remarks demonstrate pervasive bias and unfairness that actually prejudice a party."  Hill, 643 F.3d at 845-46 (citations and quotation marks omitted).

Here, Defendant Johnson put the government to its burden by objecting to the two firearms enhancements and the facts supporting them set forth in the PSI.  See United States v. Lawrence, 47 F.3d 1559, 1566 (11th Cir. 1995) ("When a defendant challenges one of the factual bases of his sentence as set forth in the PSR, the Government has the burden of establishing the disputed fact by a preponderance of the evidence.").  By objecting, Johnson also triggered the district court's obligation to resolve the factual dispute as to whether Johnson was involved in Sangster's illegal firearm sales.  See Fed. R. Crim. P. 32(i)(3)(B) (requiring district court to either rule on disputed portions of the PSI or determine

11

that a ruling is unnecessary); <u>United States v. Owen</u>, 858 F.2d 1514, 1517 (11th Cir. 1988) (explaining that the trial judge's obligation under Rule 32 to make a fact finding is triggered by the defendant's objection to the PSI). In an attempt to carry its burden, the government called Sangster as a witness, but Sangster unexpectedly refused to testify.

Given that the district court has the ability to bring out needed facts, including to call its own witnesses if necessary, we cannot say the district court abused its discretion or crossed into improper advocacy merely by asking the prosecutor whether, in light of Sangster's last-minute refusal to testify, he wished to call one of the agents who had interviewed Sangster. The district court's question did not indicate that it had pre-judged the sentencing issues it was called upon to resolve or was predisposed to rule in favor of the government. Indeed, the fact that the district court sustained two of Johnson's other sentencing objections indicates that the district court remained able to render a fair judgment and that Johnson was not deprived of a fair sentencing hearing. At most, the district court's question to the prosecutor here is similar to the district court's prompting in <u>Wright</u>, where the government had failed to elicit a statement from a witness that was necessary to its case. <u>See</u> <u>Wright</u>, 392 F.3d at 1272. In short, the district court's question to the prosecutor was within its discretion and did not

12

demonstrate the kind of "pervasive bias" needed to show reversible error.

**AFFIRMED.**