[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14584
_____

D.C. Docket No. 1:13-cr-20561-RNS-4


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEAN OSCAR,
a.k.a. ZB,
HYPICO BEAULIEU,
a.k.a. Pico,
a.k.a. Dred,

Defendants-Appellants.
_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(December 20, 2017)

Before HULL, JORDAN and BOGGS,[*] Circuit Judges.

HULL, Circuit Judge:

Defendant Hypico Beaulieu appeals his six criminal convictions and his sentence, all related to drug trafficking and the illegal possession of firearms. Co-defendant Jean Oscar appeals his two convictions for being a convicted felon in possession of a firearm on two different dates. Their appeals present five issues, implicating the lengthy investigation that led to their arrests and their joint criminal trial.

After careful review, and with the benefit of oral argument, we affirm Beaulieu's and Oscar's convictions. We vacate Beaulieu's sentence imposed under the Armed Career Criminal Act and remand for resentencing.

## I.  BACKGROUND

### A.    Indictment

On October 8, 2013, a grand jury indictment in the Southern District of Florida charged Beaulieu with conspiring to distribute cocaine and crack cocaine, in violation of 21 U.S.C. § 846 (Count One); three counts of distributing cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts Two, Three, and Four); stealing more than $1,000 from the United States, in violation of 18 U.S.C. §§ 641 and 2 (Count Five); possessing with the intent to distribute cocaine and crack cocaine, in

---

[*]Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

violation of 21 U.S.C. § 841(a)(1) (Count Six); possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Seven); and being a convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count Eight).

That same indictment also charged Oscar with two counts of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). The same indictment also charged crimes against seven of Beaulieu's and Oscar's co-defendants: Francisco Castellon, Sandy Saintange, Christopher Dalpe, Aaron Hines, Gary Alexander, Ronald Prudent, and Lonnie Clanton. Ultimately, five of those co-defendants pled guilty, but not Saintange, who is a fugitive.

On June 2, 2014, Beaulieu, Oscar, and Dalpe proceeded to trial. At trial, co-defendant Castellon testified against them.

## B.     Trial, Convictions, and Sentences

At trial, the government presented the testimony of (1) the undercover agent ("UA") who purchased contraband from the defendants, (2) the Department of Homeland Security ("DHS") agent who led the investigation, and (3) various federal and local law enforcement officers involved in the investigation. Beaulieu, Oscar, and Dalpe did not testify. Beaulieu did, however, offer the testimony of Renetta Smith, his girlfriend, who testified that she owned the firearm found in

3

Beaulieu's residence. The parties finished their closing arguments on June 6, 2014.

On the fourth day of jury deliberations, the jury returned its verdict, convicting Beaulieu of Counts One, Three through Six, and Eight and acquitting him of Counts Two and Seven. The jury convicted Oscar of the two felon-in-possession counts.

On October 3, 2014, the district court sentenced Beaulieu to 210 months' imprisonment and Oscar to 144 months' imprisonment. This timely appeal followed.[1] We first review the trial evidence and then discuss the five issues presented on appeal.

## II.  TRIAL EVIDENCE

In 2012, DHS launched an investigation into narcotics trafficking in the greater Miami, Florida area. By making controlled contraband purchases, the UA infiltrated a neighborhood where narcotics and illegal firearms sales were common. The UA's investigation eventually focused on Saintonas Oscar ("Saintonas"), who brokered sales of narcotics and firearms between the UA and multiple people. Defendant Oscar is a cousin of Saintonas.

---

[1]The government also filed a cross-appeal concerning Oscar's sentence, arguing that the district court erred when it ruled that Oscar's prior drug convictions did not count as "serious drug offenses" under the Armed Career Criminal Act. On December 6, 2016, the government filed a motion to voluntarily dismiss its appeal. On December 8, 2016, this Court granted that motion.

For controlled purchases of narcotics and firearms, the UA would call Saintonas, negotiate a price for the contraband, and agree on a meeting time and location. The UA would drive to the agreed-upon location to complete the transaction, with Saintonas present to facilitate the exchange of money and contraband between the UA and the seller.

## A.    November 7 and 15, 2012 Sales

On November 7, 2012, the UA made a controlled narcotics purchase from defendant Beaulieu. The UA called Saintonas and ordered one ounce of cocaine. Saintonas agreed to the sale and instructed the UA to drive him to the Food Point Mart in Hallandale Beach, Florida. Upon arrival, the UA saw Beaulieu, who was walking towards the Food Point Mart parking lot from an adjacent field. While Beaulieu was approaching, the UA paid Saintonas $1,150 in cash. Saintonas then exited the car, "made contact" with Beaulieu, and returned to the UA with one ounce of cocaine.

On November 15, 2012, the UA again ordered cocaine from Saintonas. After the UA and Saintonas agreed on a price, they set a time and location for the transaction. The UA and Saintonas met and travelled together to the same Food Point Mart, where Beaulieu was again present. Similar to the transaction on November 7, Saintonas took $1,800 in cash from the UA upon arrival, before

5

leaving the UA to meet with Beaulieu.  Saintonas then returned to the UA with one-and-a-half ounces of cocaine.

**B.      January 8, 15, and 18, 2013 Sales**

On January 8, 2013, the UA purchased a sawed-off shotgun from Saintonas with defendant Oscar present.  After completing the purchase, the UA spoke to Oscar about buying three more firearms, and they negotiated the price for two of them.

On January 15, 2013, the UA asked Saintonas to help him obtain a firearm.  Saintonas told the UA that there was a pistol for sale for $300, and the UA agreed to purchase it.

Later that day, Saintonas and the UA arrived at Saintonas' residence, and, in the front yard, the UA saw Oscar with the pistol in his waistband.  The UA took that firearm and gave Saintonas $300 in cash.  During the transaction, Oscar told the UA that he had fired the pistol.  Saintonas and the UA then discussed the purchase of a rifle.

On January 18, 2013, after agreeing to purchase a rifle, the UA called Saintonas.  At Saintonas' instruction, the UA picked up Saintonas and Oscar in the UA's vehicle.  Oscar directed the UA to a second location, where they picked up a fourth person who was not identified at trial.  That fourth person directed the UA to an apartment where the firearm was located.  Once at the apartment, Oscar and

6

the fourth person walked towards a stairwell. The UA gave Saintonas $700 in cash before Saintonas also walked to the stairwell. The UA then exited his vehicle, opened the trunk, and waited. Oscar and the fourth person exited the stairwell and walked to the rear of the UA's vehicle. Once at the vehicle, Oscar pulled a rifle out of the right leg of his pants and placed it in the UA's trunk.

## C.    February 27, 2013 Attempted Sale

On February 27, 2013, the UA negotiated the purchase of two firearms—a rifle and a pistol—from Saintonas. The UA drove to Saintonas' residence. Saintonas approached the UA's car, and the UA handed him $1,800 in cash. Saintonas then walked away from the UA's vehicle and did not return. Saintonas never delivered the firearms. After Saintonas departed, the UA waited for 45 minutes, repeatedly calling Saintonas' phone to no avail. During this 45-minute period, while waiting for the firearms, the UA noticed Oscar arrive at Saintonas' residence. Oscar approached the UA and told him that Saintonas had already sold the firearms but that the UA should buy firearms directly from Oscar. During this conversation, Oscar offered to sell the UA "a .45 revolver."

## D.    April 2, 2013 Sale

On April 2, 2013, Saintonas, in an effort "to make things right," referred the UA to Beaulieu, from whom the UA previously had purchased cocaine. Similar to the purchases conducted through Saintonas, the UA met Beaulieu at the Food Point

Mart.  After Beaulieu entered the UA's vehicle, the UA gave Beaulieu $1,150 in cash in exchange for one ounce of cocaine.

### E.    April 11, 2013 Attempted Sale

On April 11, 2013, the UA and Beaulieu negotiated a purchase of two ounces of cocaine for $2,300.  When the UA and Beaulieu arrived at the Food Point Mart for the cocaine sale, the UA noticed that there was no activity at the store and that the only other car in the parking lot was a Ford F-150 backed into a parking spot.  The UA observed the driver of the vehicle, who "just seemed to be staring straight ahead."  After waiting a few minutes, the UA called Beaulieu.  As he had for past transactions, Beaulieu approached from the field adjacent to the Food Point Mart.  Once Beaulieu entered the car, the UA handed him $2,300 in cash.

But unlike past purchases, Beaulieu did not hand the narcotics to the UA.  Instead, Beaulieu began to count the cash slowly.  While Beaulieu was counting, the driver of the Ford F-150 exited his vehicle, holding one hand to his chest.  As the driver of the Ford F-150 went to shut his door, a silver badge fell from underneath the hand on his chest.  The driver approached the left side of the UA's vehicle.

As the driver of the Ford F-150 was nearing the UA's vehicle, Beaulieu exited the UA's vehicle on the passenger's side and ran to the front of the UA's

8

vehicle. As Beaulieu ran away, the driver turned, ran, got into the Ford F-150, and began pursuing Beaulieu, who was fleeing on foot. As the driver began his pursuit, driving westbound away from the Food Point Mart, the UA fled the parking lot in his car. Later that day, the UA called Beaulieu to complain about "being ripped off," as Beaulieu had taken the $2,300 without giving the UA any cocaine.[2]

That same day, April 11, shortly after Beaulieu "robbed" the UA, two Drug Enforcement Agency ("DEA") agents stopped Beaulieu in a vehicle as he was leaving his residence. DHS Agent Jubal Gimble, who led the investigation against Oscar and Beaulieu, also arrived at the scene and was present when one of the DEA agents told Beaulieu that he was aware of the robbery and "just want[ed] the money back . . . [t]hat's it." Beaulieu complied and also consented when Agent Gimble and a DEA agent asked to come to his residence to retrieve the money. Beaulieu took the law enforcement agents inside his residence and gave them $2,200 in cash that he had taken from the UA.[3]

## F.    August 16, 2013 Arrests

On August 16, 2013, federal and local law enforcement officers arrested Beaulieu at his mother's residence after obtaining an arrest warrant. A search of

---

[2]As was revealed at trial, the driver of the Ford F-150 was Francisco Castellon, Beaulieu's friend. Castellon was a co-defendant but pled guilty. At trial, Castellon testified that he had agreed to pose as a police officer during the cocaine transaction because Beaulieu paid him $100 to do so.

[3]Law enforcement officers had already retrieved $100 from Castellon.

the home revealed $1,473 in cash in Beaulieu's shorts; two plastic bags of cocaine in the bathroom; and a firearm, ammunition, marijuana, crack cocaine, and drug trafficking paraphernalia in Beaulieu's bedroom. DHS agents arrested Beaulieu and transported him to a DHS office. Before questioning him, the agents advised Beaulieu of his Miranda[4] rights, and Beaulieu affirmed that he understood his rights by signing a Miranda waiver form. Beaulieu then admitted that he had sold cocaine to Saintonas and the UA. Beaulieu also admitted that the firearm in his bedroom was his and that he knew he was not allowed to possess a firearm. Beaulieu claimed that he had bought the firearm in order to protect himself.

Oscar was arrested a few days later, on August 19, 2013.

With this trial evidence as background, we turn to the five issues on appeal.

### III.  JURY'S QUESTIONS

A.    Court's Answer

The first issue is Beaulieu's challenge to the district court's answer to two written jury questions about possession of a firearm by a convicted felon.[5] The first question asked: "If you are a convicted felon, does the law specify whether or not you can knowingly be near or around a gun or is there space specification (in

---

[4]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[5]Oscar does not raise this issue on appeal.

the room or just near)?"  The second question asked: "If a convicted felon, is it illegal just to be 'around' a firearm?"

Beaulieu's defense counsel argued that the district court should respond "no" to both questions.  The government advocated that the district court should instruct the jury to rely on the district court's prior instructions.  The district court had fully instructed the jury already on the elements of this firearm offense, as follows:

> A defendant can be found guilty of this crime only if all of the following facts are proved beyond a reasonable doubt:
> 1. The defendant knowingly possessed a firearm or ammunition in or affecting interstate or foreign commerce and;
> 2. Before possessing the firearm, or ammunition, the defendant had been convicted of a felony, a crime punishable by imprisonment for more than one year.

(emphasis added).

After defining firearm, ammunition, and interstate commerce, the district court also initially instructed the jury on actual and constructive possession as follows:

> The law recognizes several kinds of possession.  A person may have actual possession, constructive possession, sole possession or joint possession.  Actual possession of a thing occurs if a person knowingly has direct physical control of it.  Constructive possession of a thing occurs if a person does not have actual possession of it, but has both the power and the intention to take control over it later.  Sole possession of a thing occurs if a person is the only one to possess it. Joint possess[ion] of a thing occurs if two or more people share possession of it.  The term "possession" includes actual, constructive, sole and joint possession.

11

Beaulieu did not object to this initial instruction.

After receiving the jury's questions and hearing from defense counsel and the government, the district court proposed this answer to both questions:

> Members of the jury, the definition of possession is fully set forth on page 15 of the instructions. It is not sufficient to be around or near a gun. The government must prove beyond reasonable doubt that the defendant <u>either</u> knowingly had actual direct physical control of the gun <u>or</u> if he did not have actual possession of it, that he had both the power and intention to take control over the gun later.
>
> A defendant may have sole possession if he is the only person to possess the gun, or he may have joint possession if he and another share possession of it.

(emphasis in original). After hearing from counsel, the district court sent a note to the jury reciting the foregoing answer.

## B.    Analysis

Beaulieu argues that the district court erred in its answer to the jury's questions by allowing the jury to convict him of either constructive or joint possession, without Beaulieu's having knowledge of the presence of the firearm. For several reasons, we conclude there was no error in the district court's answer.[6]

First, the district court's answer requires context. The district court's original jury instruction had already explained the elements of the crime and expressly told the jury that the government must prove that Beaulieu "knowingly

---

[6]We review a district court's response to a jury question for an abuse of discretion. United States v. Wright, 392 F.3d 1269, 1279 (11th Cir. 2004).

12

possessed" the firearm. A challenged supplemental jury instruction is not reviewed in isolation, but reviewed as part of the entire jury charge. United States v. Lopez, 590 F.3d 1238, 1248 (11th Cir. 2009); United States v. Johnson, 139 F.3d 1359, 1366 (11th Cir. 1998). The initial charge made it clear that Beaulieu had to "knowingly" possess the firearm. See United States v. Hill, 799 F.3d 1318, 1320-21 (11th Cir. 2015) (district court did not abuse its discretion when it declined to give defendant's proposed jury instruction because the instruction already given "adequately covered" the defendant's proposed instruction).

Second, the district court's initial charge correctly told the jury that the law recognizes several kinds of possession and that possession of a firearm may be either actual or constructive. United States v. Perez, 661 F.3d 568, 576 (11th Cir. 2011). "[T]he essence of constructive possession is the power to control the contraband itself." United States v. Cochran, 683 F.3d 1314, 1320 (11th Cir. 2012) (emphasis added). Thus, the district court correctly instructed the jury that constructive possession occurs when a defendant "has both the power and the intention to take control" of the firearm.

Third, this definition of constructive possession did not remove the knowledge requirement but was consistent with it. Indeed, a defendant must necessarily have knowledge of the firearm in order to have a present intention to take control over it later. This Court has explained before that this definition of

13

constructive possession implies a requirement of "knowledge or an awareness of the object possessed." See Hill, 799 F.3d at 1321 (stating this definition of constructive possession "impliedly required that Hill knowingly possess the firearm"); United States v. Winchester, 916 F.2d 601, 605 (11th Cir. 1990) (concluding that a jury instruction, which defined "constructive possession" as when a person "has both the power and intention to later take control over something," did not constitute reversible error because it "defined 'constructive possession' as impliedly requiring knowledge or awareness of the object possessed").

Here, the district court's supplemental charge thus did not misstate the law as to possession or knowledge, and there was no error.

## IV.  PROSECUTORIAL MISCONDUCT

Beaulieu's second claim on appeal is that the government committed misconduct that prejudiced his right to a fair trial when (1) it introduced evidence of the murder of Saintonas and (2) it called Renetta Smith a liar.  We review the context of both events and then explain why neither constituted misconduct.[7]

---

[7]A claim of prosecutorial misconduct ordinarily is reviewed de novo.  United States v. Merrill, 513 F.3d 1293, 1306-07 (11th Cir. 2008).  Even though Oscar, not Beaulieu, first objected to the government's reference to Saintonas' death, Oscar on appeal does not raise any claims of prosecutorial misconduct as to Saintonas' death.

14

## A.    Saintonas Oscar

On the afternoon of June 2, after jury selection but before the trial commenced, defendant Oscar requested that the government not mention that Saintonas was murdered. Oscar argued that evidence of Saintonas' murder would be highly prejudicial, as the jury might infer that one of the defendants was involved in his murder.

In response, the government explained that it was not going to say that Saintonas was murdered but would say only that he was dead to explain the context of the investigation. Although Oscar argued that Saintonas' death was irrelevant, the district court ruled that the government was allowed "to mention [that] he is deceased, but not that he was murdered or killed." Beaulieu did not object to this ruling. As discussed later, Saintonas' death was relevant to explain why he was not charged and was not testifying at trial, even though he facilitated all of the defendants' crimes.

During its opening statement, the government explained that Saintonas distributed contraband to the UA and arranged the multiple transactions that underlay the charges against the defendants. After describing the charges against the defendants, the government stated "Finally, ladies and gentlemen, what about Saintonas Oscar. You've heard a lot about some other people, but what about

15

Saintonas Oscar. As you will hear, Saintonas Oscar is dead. Saintonas Oscar died in May of last year." There was no contemporaneous objection.

At the end of the first day of trial, after the district court dismissed the jury, co-defendant Dalpe moved for a mistrial. Dalpe argued that the government's proclamation that Saintonas was dead was prejudicial to his defense.[8] The district court denied the motion.

Saintonas' death was also the subject of the UA's testimony. On direct examination by the government, the UA testified that Saintonas "is deceased." In addition, during his cross-examination of the UA, Beaulieu's counsel asked "[Saintonas] is dead now, correct?"

But then a dispute arose when DHS Agent Gimble testified. Beaulieu's counsel asked, "So you were satisfied that whatever you had, you would run with it when you met with the representatives of the United States Attorney's Office?" Agent Gimble responded that DHS would have liked to continue the investigation but that "Saintonas at that point was dead." Agent Gimble continued, stating: "Hypico [Beaulieu] was the only other person that we really mainly dealt with, that we dealt with face-to-face other than Jean [Oscar] on a couple of times, but there

---

[8]Dalpe's counsel did not articulate a clear legal ground for his objection but did implicitly state that Saintonas' death was not relevant to the case:

I think that that was an inference that because of this situation he is dead and, you know, long pause, drugs and guns, and I just—we don't have any idea, I don't at least, of how or why this person passed away and I don't understand the relevance to this case and so I make my motion.

were some issues between the undercover officer and Jean [Oscar] and his brother John.  They felt that he was somehow involved in [Saintonas'] death because of Saintonas' ripping off Special Agent Lampkins [the UA]."

Oscar then objected and moved for a mistrial.[9]  The district court overruled the objection and denied the motion.  The district court reasoned that Beaulieu's counsel had "asked a very broad, open-ended question" and no objection was made to the question when asked.  The district court agreed, however, to give a curative instruction, telling the jury that none of the defendants on trial had anything to do with Saintonas' death:

> [T]here is absolutely no information that anybody in this trial had anything to do with the death of Saintonas Oscar, so please don't think the fact that it was mentioned there is something out there, maybe there's something else going on. That is just not part of this case. You heard that he is no longer among the living. None of these people that are in this trial had anything to do with his death.

Shortly after this instruction, Beaulieu's counsel asked Agent Gimble if Miami homicide detectives had assisted in arresting Beaulieu.  Agent Gimble responded "yes," but before he was able to explain why, Beaulieu's counsel interjected with another question.  Later during his cross-examination of Gimble, Beaulieu's counsel asked "How many detectives [talked] to [Beaulieu on the day of his arrest]?"  Agent Gimble responded that Miami-Dade homicide detectives

---

[9]Earlier in the trial, the district court said that it would consider an objection by one defendant to be an objection by all of them unless a co-defendant opted out.  Thus, we consider this objection as by defendant Beaulieu too.

17

"were the only other ones that talked to him." Counsel for Dalpe objected, but the district court overruled the objection.

Later, in his closing argument, Beaulieu's counsel noted on three occasions that Saintonas was dead.

## B.    Renetta Smith

On the second-to-last day of trial, June 5, defendant Beaulieu called Renetta Smith as a witness. Smith identified herself as Beaulieu's girlfriend and testified that she was living with Beaulieu at his mother's house when he was arrested. Earlier in the trial, Francisco Olive, a DHS agent who assisted in the arrest of Beaulieu, testified that Smith initially told the agents that Beaulieu was not home when in fact he was. Smith disputed Olive's account, claiming that it was Beaulieu's mother who told the agents that Beaulieu was not home. As recounted earlier, a firearm was found in the closet of Beaulieu's bedroom. At trial, Smith testified that the firearm was hers.

On cross-examination, with no objection from Beaulieu, the government asked Smith if she had been lying about this case, to which she stated "no." The government then confronted her about her inconsistent statements and the contradictory evidence concerning Beaulieu's presence on the day of his arrest, her statements concerning the type and location of the firearm found in Beaulieu's closet, and whether she or Beaulieu owned the firearm.

18

Later, in closing, the government—again with no objection from Beaulieu—stated: "You heard Renetta Smith get up on the stand and tell you now that that gun is hers. Ms. Smith is lying." The government then noted that, even though Smith had stated that the firearm was hers, she could not describe the firearm's specifications or how it operated. The government also emphasized that Smith claimed that the firearm was hers only after Beaulieu had lost his suppression motion.

The government's closing argument also referenced an audio recording introduced during Agent Gimble's testimony. The recording was a telephone conversation between Beaulieu and Smith. On the audio tape Smith is heard stating: "He told me that was going to be the plan B after the suppression didn't work. . . . The fact that it's mine." When questioned about this recording, Smith testified that she had told Beaulieu's previous lawyer that she was the owner of the gun that was found in the closet on August 16, 2013, but prior counsel told Smith not to worry about it because he was going to file a motion to suppress the firearm. Smith testified that Beaulieu fired that attorney and hired the current counsel as his trial attorney. Smith explained that the "Plan B" discussed in the recorded call referred to Beaulieu's plan to fire his previous attorney if his motion to suppress was unsuccessful.

19

The government concluded its closing discussion of Smith by arguing that "[s]he has lied before and she is lying now.  She lied when agents went to the house and asked her is [Beaulieu] home[?]  She said no.  He was there.  She lied today and said, no, I never said that, and now she is lying today."

## C.    Discussion

For a prosecutor's remarks to constitute prosecutorial misconduct, they must (1) be improper and (2) prejudicially affect the defendant's substantial rights. United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006).  "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different."  Id..

On appeal, Beaulieu argues that the government's opening statement violated the district court's order by implying that Saintonas was murdered.[10]  A review of the transcript reveals that Beaulieu misrepresents the government's description of Saintonas' death.  Contrary to his claim on appeal, the government did not refer to Saintonas' death before stating that "drugs and guns are dangerous."  Rather, the government's handling of Saintonas' death was consistent with the district court's order—not discussing murder, but simply explaining his absence, as he was deceased.

---

[10]Beaulieu alleges that the prosecutor, "in dramatic fashion" said that "Saintonas Oscar is dead . . . Drugs and guns are dangerous."

20

Further, the district court did not err in allowing the government to tell the jury that Saintonas had died.  It was relevant to explain why Saintonas, even though he had brokered the drug and firearm sales and was a link between the defendants, was not present as a co-defendant or witness.  Moreover, any potential prejudice from mentioning Saintonas' death was cured by the district court's curative instruction, which emphasized that no one at trial had anything to do with the death.  United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir. 1995) (concluding that curative instruction rendered allegedly prejudicial remark harmless).  In short, the government did not act improperly in mentioning Saintonas' death before the jury.

It was also not improper for the government to state that Smith was lying during closing argument given Smith's inconsistencies.  Agent Olive testified that Smith told DHS officers that Beaulieu was not at home when he in fact was.  Smith testified that she owned the gun but was unable to describe the basic parts of the gun.  Smith's testimony is also contradicted by Beaulieu's admission on the day of his arrest that he owned the gun.  In her recorded telephone conversation, Smith appeared to reference her claim of owning the gun (which occurred after Beaulieu lost his motion to suppress) as "Plan B."  The government's statements in closing were not improper, nor did they prejudicially affect Beaulieu's substantial rights.  Again, there was no error, much less plain error.  See United States v. Schmitz,

21

634 F.3d 1247, 1270 (11th Cir. 2011) ("We have no doubt that there are some cases where a prosecutor is justified in arguing during closing arguments that a particular witness is lying, if that is an inference supported by the evidence at trial."); see also Chandler v. Moore, 240 F.3d 907, 914 (11th Cir. 2001) (finding that prosecutor's comment during closing argument that a witness was a liar was an accurate statement because the witness had told different stories regarding the defendant's whereabouts).

This leaves Agent Gimble's statements about the death of Saintonas. Beaulieu timely objected at trial and thus we review this issue de novo. Gimble's testimony came out on questioning from Beaulieu's own counsel, raising the possibility that Beaulieu has waived this argument through the doctrine of invited error. United States v. Parikh, 858 F.2d 688, 695 (11th Cir. 1988) (holding "the admission of out of court statements by a government witness, when responding to an inquiry by defense counsel, creates 'invited error,'" because "[d]efense counsel effectively caused the injury about which he now complains by questioning the witness about the contents of the letter," which was the objectionable matter).

However, we need not, and do not, rely on invited error because the district court gave a strong curative instruction, stating as a fact that none of the defendants had anything to do with Saintonas' death. This instruction cured any alleged prejudice. See Thomas, 62 F.3d at 1343; United States v. Sanchez, 722 F.2d 1501,

22

1508-09 (11th Cir. 1984) (holding that limiting instruction cured any prejudice to the defendant when, in response to the prosecutor's question, a witness stated that the defendant had told him that two people were killed as a result of a failed drug transaction during the conspiracy); see also United States v. Shenberg, 89 F.3d 1461, 1472 (11th Cir. 1996) ("We presume that a jury follows the court's instructions.").

We acknowledge that Beaulieu relies heavily on United States v. Harriston, 329 F.3d 779, 786-89 (11th Cir. 2003), where this Court vacated a conviction and ruled that a mistrial should have been declared based on the statements of a witness that the defendant on trial had a prior murder conviction. Harriston is materially different. For starters, the Harriston witness's statements concerned a murder conviction of the defendant on trial, and one of the predicate RICO acts charged against that defendant was murder. Id. at 786-87. Here the statement was, at worst, an implication that the defendants may have been involved in the death of Saintonas. Importantly too, the testimony at issue in Harriston was elicited by the prosecutor, rather than defense counsel. Id. at 786.

For these reasons and even under de novo review, we conclude that Beaulieu has not shown any prosecutorial misconduct as to Saintonas' death or Smith's lying. And the district court's jury instruction cured any prejudice from Agent Gimble's responses to the questions posed by Beaulieu's counsel.

23

## V.  JUROR 11

Oscar and Beaulieu challenge three of the district court's rulings made during the jury's deliberations: (1) the giving of an <u>Allen</u>[11] charge, both in its contents and its timing; (2) the dismissal of Juror 11; and (3) the replacement of Juror 11 with an alternate juror.  We discuss what happened during the jury's deliberations and review each ruling in turn.[12]

### A.    Background

On June 9—the second day of jury deliberations—Juror 11 sent the district court a note.  Juror 11's note explained that, even though she had initially asserted during voir dire that she had no bias concerning this case, her answer had changed.  Juror 11 asked to be excused from the case.

The government recommended excusing Juror 11 and seating an alternate.  The defendants requested that the district court question her.  The district court agreed with the defendants.  When questioned by the district court, Juror 11 expressed concerns that the criminal justice system was prejudiced, that innocent people were being convicted, and that the other jurors were biased.  When asked to specify, Juror 11 could not cite any examples of other jurors making biased statements.  Juror 11 went on to explain that, although she came into the case with

---

[11]<u>Allen v. United States</u>, 164 U.S. 492, 17 S. Ct. 154 (1896).

[12]On September 5, 2017, Beaulieu filed a motion to adopt the arguments advanced by Oscar on this juror dismissal issue.  This Court granted the motion on September 19, 2017.

an open mind, she was now "in a defense mode" to "defend[] my people." Juror 11 also noted that she and the other jurors could not come to an agreement after discussing the case and that her disagreement was based on the law.

The government asked that Juror 11 be excused because she had expressed bias. The defendants argued that Juror 11 should remain. The district court then described its concern: "[M]y concern is that she has strongly stated that she doesn't believe she can continue to deliberate with the other jurors in light of her feelings that they themselves are biased." The district court recognized that "[i]t seems like there's a significant number in her mind of people who she believes are biased." Still, the district court noted, the jury had been deliberating for over a day.

Oscar moved for a mistrial while Beaulieu advocated that the jury be instructed to renew their discussions with Juror 11 remaining on the jury. The district court denied Oscar's motion for a mistrial but chose not to dismiss Juror 11. The district court then gave the jury an Allen charge without any objections. The district court used the Eleventh Circuit pattern modified Allen charge with minor variations. See Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010, Judicial Council of the Eleventh Circuit (June 21, 2010). The jury continued to deliberate.

The next day, on June 10, the jury sent the district court another note, stating: "A juror has expressed that the evidence is irrelevant and wants a hung

25

jury. For count[s] 3 and 8. We all disagree. She has stated that she can not be impartial and isn't following the law."

The government responded that if a juror is not deliberating, she should be excused. Beaulieu argued that the jury was hung, and Oscar moved for a mistrial. The district court—over Beaulieu's and Oscar's objections—questioned the jury foreperson, who stated that the jury note was about Juror 11.

The district court questioned Juror 11 again. Juror 11 stated that she had "tried to" follow the law but that "I don't think that some of the decisions I really did follow the law" because "too many emotions are involved in it." Juror 11 accused the other jurors of being biased, although she clarified that she meant that they were disrespectful of her and her opinions. At one point, Juror 11 stated, "No, I am not fair," before noting that she was "biased" because she was "defending" herself, as the system "is still bad for a lot of people." The district court then asked Juror 11 to return to the jury room.

At this point, the government requested for a third time that Juror 11 be removed because she had indicated that she could not be fair or deliberate. In particular, the government highlighted Juror 11's repeated statements that her emotions were influencing her and that she had begun crying when discussing the prospect of someone going to prison.

26

Oscar moved for a mistrial, again.  The district court denied Oscar's motion, explaining that it was removing Juror 11 and replacing her with an alternate because Juror 11 had admitted that she was not following the law and could not give any examples as to how the jury was biased.  The district court instructed the remaining jurors that it was bringing in an alternate, which meant that deliberations would have to start anew.  As consented to by the parties, the district court also shortly thereafter substituted a second alternate for Juror 12 due to a family medical emergency.

The next morning, on June 11, Oscar again moved for a mistrial, which the district court denied.  The district court instructed the jurors "to commence your deliberations anew" at 9:06 a.m.  Later that evening, at 6:35 p.m., the jury reached its verdict, convicting Beaulieu of Counts One, Three through Six, and Eight and acquitting him of Counts Two and Seven.  The jury also convicted Oscar of both counts charged against him.

## B.    **Allen Charge**

Oscar contends that a new trial is required because the Allen charge coerced the jury requiring a new trial.  We disagree and explain why.[13]

---

[13]We review a district court's decision to give an Allen charge for abuse of discretion. United States v. Bush, 727 F.3d 1308, 1320 n.6 (11th Cir. 2013).  We may reverse only if we find that, under the totality of the circumstances, the Allen charge was inherently coercive. United States v. Chigbo, 38 F.3d 543, 545 (11th Cir. 1994); United States v. Brokemond, 959 F.2d 206, 208 (11th Cir. 1992).

First, the text of the <u>Allen</u> charge given was the Eleventh Circuit pattern jury instruction, which this Court repeatedly has held is appropriate and not coercive. See, e.g., <u>United States v. Bush</u>, 727 F.3d 1308, 1320 (11th Cir. 2013); <u>United States v. Woodard</u>, 531 F.3d 1352, 1364 (11th Cir. 2008).

Second, the timing of the <u>Allen</u> charge was also not coercive. With respect to timing, it is within the trial court's discretion to decide when to give an <u>Allen</u> charge. <u>United States v. Alonso</u>, 740 F.2d 862, 877 (11th Cir. 1984). An <u>Allen</u> charge is not "premature just because the jury did not expressly state that it was deadlocked," as "[o]ur precedent does not require such an express indication of deadlock before the district court gives an <u>Allen</u> charge." <u>Bush</u>, 727 F.3d at 1321.

Here, in giving the <u>Allen</u> charge, the district court properly interpreted Juror 11's initial comments to indicate that the jury's deliberations had stalled, especially given that Juror 11 had stated that "we're not going to get anywhere," and that the other jurors had "already figured out what they [were] going to do." Juror 11 also responded "yes" when the district court asked if the jurors "just can't agree."

Third, the fact that the jury continued to deliberate for several more days reflects the non-coercive nature of the <u>Allen</u> charge. Fourth, the jury acquitted Beaulieu of Counts Two and Seven, further suggesting that the district court's <u>Allen</u> charge did not coerce their deliberations.

28

The Allen charge and its timing were not coercive, and did not taint the entire trial or cause the resulting convictions to violate due process. Accordingly, the district court did not abuse its discretion in giving the Allen charge.

## C.    Dismissing Juror 11

We also must reject Beaulieu's claim that the district court erred in dismissing Juror 11 and denying Oscar's motions for a mistrial.[14] Generally, courts should be cautious about dismissing a juror, unless it is evident that the juror will impede a just outcome, and courts "may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence." United States v. Brown, 823 F.2d 591, 596 (D.C. Cir. 1987). Because a district court could misread a juror's motives, it must be cautious to avoid the danger "that a dissenting juror might be excused under the mistaken view that the juror is engaging in impermissible nullification." United States v. Abbell, 271 F.3d 1286, 1302 (11th Cir. 2001).

Nonetheless, sometimes dismissal is appropriate. Good cause exists to dismiss a juror "when that juror refuses to apply the law or to follow the court's instructions." Id.; United States v. Thomas, 116 F.3d 606, 613 (2d Cir. 1997)

---

[14]A district court's denial of a motion for a mistrial is reviewed for an abuse of discretion. United States v. Ronda, 455 F.3d 1273, 1296 n.33 (11th Cir. 2006); United States v. Dominguez, 226 F.3d 1235, 1247 (11th Cir. 2000). A district court's decision to excuse a juror after the start of deliberations is also reviewed for abuse of discretion. United States v. Polar, 369 F.3d 1248, 1253-54 (11th Cir. 2004); United States v. Abbell, 271 F.3d 1286, 1302 (11th Cir. 2001). Whether a juror is following the law is a finding of fact, which this Court reviews for clear error. Abbell, 271 F.3d at 1302-03.

("[Federal Rule of Criminal Procedure] Rule 23(b) dismissals have been upheld repeatedly in cases where the trial court found that a juror was no longer capable of rendering an impartial verdict."). Ultimately, the district court should excuse the juror "only when no 'substantial possibility' exists that she is basing her decision on the sufficiency of the evidence." Abbell, 271 F.3d at 1302 (describing this as a "beyond a reasonable doubt" standard).

In questioning a juror, the district court also must take care not to invade the secrecy of the jury's deliberations and, thus, must "err on the side of too little inquiry as opposed to too much." United States v. Augustin, 661 F.3d 1105, 1133 (11th Cir. 2011) (quotation marks omitted). To put it differently, a reviewing court "will reverse the district court only if [it] find[s] that [the district court] discharged the juror 'without factual support, or for a legally irrelevant reason.'" Abbell, 271 F.3d at 1302 (quoting United States v. Register, 182 F.3d 820, 840 (11th Cir. 1999)).

Each of the district court's colloquies with Juror 11 demonstrates that the district court did not abuse its discretion in dismissing Juror 11. In her second colloquy with the district court—on June 10, the third day of jury deliberations— Juror 11 stated that she was biased, was not "fair," and was too emotional to follow the law. These statements came in addition to Juror 11's remarks on June 9, the second day of jury deliberations, where she decried a biased criminal justice

system and described her need to "defend [her] people."[15]   Furthermore, towards

the end of the district court's questioning on June 10, Juror 11 began crying when

discussing the prospect of the defendants going to prison.  Indeed, Oscar concedes

that Juror 11 could not proceed once she became emotional.

Simply put, district courts are to be afforded significant discretion in

dismissing a juror.  Id. at 1303.  ("[T]he district court is uniquely situated to make

the credibility determinations that must be made . . . where a juror's motivations

and intentions are at issue.").  Juror 11's statements establish that "no 'substantial

possibility' exist[ed] that [Juror 11 was] basing her decision on the sufficiency of

the evidence," id. at 1302, including her statements that (1) she was not following

the law; (2) she was biased; (3) she believed that "[t]here's something—something

very wrong about the system"; (4) she could not be fair; and (5) she would not

deliberate with other jurors.

---

[15]The district court's colloquy with Juror 11 on June 9 went as follows:

JUROR NO. 11: But since I know they don't have an open mind, we're not going to get anywhere.  I had an open mind.  I don't have an open mind now because I already know their agenda.  I don't have an open mind.  I'm in a defense mode right now.  Defense.

THE COURT: You mean defense of yourself?

JUROR NO. 11: Defending my people.

Because she refused to follow the law and admitted her inability to be fair, the district court did not abuse its discretion when it dismissed Juror 11.[16]

## D.    Replacing Juror 11 with an Alternate Juror

Even if Juror 11 was properly dismissed, the defendants argue that the district court erred in replacing Juror 11 with an alternate juror and should have allowed deliberations to proceed with 11 jurors.  If a district court dismisses a juror, it has the option to declare a mistrial or continue with 11 jurors.  See United States v. Gabay, 923 F.2d 1536, 1543 (11th Cir. 1991); Fed. R. Crim. P. 23(b) advisory committee's note to 1983 amendment ("The amendment provides that if a juror is excused after the jury has retired to consider its verdict, it is within the discretion of the court whether to declare a mistrial or to permit deliberations to continue with 11 jurors.").  Generally, a jury in a criminal trial will consist of 12 jurors, but, where a juror is removed for good cause after the jury has retired to deliberate, the district court can permit a jury of 11 to return a verdict.  Fed. R. Crim. P. 23(b)(3).  This Court has long approved the procedure of proceeding with

---

[16]Beaulieu argues, for the first time in his reply brief, that the district court abused its discretion because it failed to identify what legal standard it employed in dismissing Juror 11.  In United States v. Abbell, this Court stated that a district court "is required to apply the 'substantial possibility' standard . . . in coming to [its] determination that the juror is or is not basing her decision on the sufficiency of the evidence."  271 F.3d at 1303.  After reviewing the trial transcript, we are confident that the district court applied the correct standard and did not abuse its discretion when it dismissed Juror 11 because it found that she was "unable to participate and follow the law."  A district court is not required to use the magic words "substantial possibility" or "beyond a reasonable doubt" when dismissing a juror.  This is especially true here, where the clear import of the district court's ruling was that there was no substantial possibility that Juror 11 would participate fairly and follow the law in deliberations.

11 jurors.  United States v. Geffrard, 87 F.3d 448, 450-52 (11th Cir. 1996);

Shenberg, 89 F.3d at 1473; Gabay, 923 F.2d at 1543.

However, Federal Rule of Criminal Procedure 24(c) allows the district court

to replace a juror with an alternate whenever it finds that a juror is unable to

perform or is disqualified from performing his duties, which is what occurred here.

Fed. R. Crim. P. 24(c)(1).  This Court has explained that the substitution of an

alternate juror after the jury has begun deliberating "constitutes reversible error

only if the defendant is prejudiced by the substitution."  United States v. Guevara,

823 F.2d 446, 448 (11th Cir. 1987).  The biggest concern about the substitution of

an alternate juror after deliberations have begun is that the remaining jurors have

already decided the verdict and will coerce any replacements.  See Shenberg, 89

F.3d at 1473.

In determining whether a defendant is prejudiced by the substitution of an

alternate juror, this Court considers several factors, such as the length and

complexity of the trial; the amount of time the jury had deliberated before a juror

was removed; the steps that the district court took to ensure that the alternate had

not been exposed to extrinsic information about the case; and whether the

remaining jurors began their deliberations anew after the alternate was substituted.

See Guevara, 823 F.2d at 448.

33

Here, this trial involved multiple defendants, over a dozen counts, and 74 exhibits. Before the substitution the jury had deliberated for about five hours on Friday and a full day on Monday and Tuesday (June 9 and 10). At the beginning of trial, the district court instructed all of the prospective jurors to avoid extrinsic evidence and "base [their] decision only on the evidence presented in court." Subsequently, the district court also instructed twice that the jury should deliberate "anew"—first on June 10 and again the following morning after substituting the two alternate jurors.[17] United States v. Acevedo, 141 F.3d 1421, 1426-27 (11th Cir. 1998) ("We assume that jurors follow their instructions."). And the district court had not only orally instructed the jury and alternates before any deliberation but also had given the jury its instructions in writing, obviating any need to recharge the jury with the alternates seated.

At bottom, Oscar and Beaulieu doubt that the two substituted jurors could have actually "deliberate[d] anew," as the other jurors had already been deliberating for several days. True, replacing an excused juror with an alternate after deliberations have begun is not favored. Geffrard, 87 F.3d at 452. But neither is having to dismiss a disruptive juror because of clear and expressed bias and refusal to follow the law. It is noteworthy too that the newly constituted jury

---

[17]When the initial 12 jurors retired to deliberate, the district court presciently explained to the two alternates that, "one of you or both of you could be called in to participate in the deliberations" and "[i]f that did happen, then we would instruct the jurors, look, you've got to start from square one."

deliberated for approximately nine more hours after the alternate jurors were substituted, indicating that the jury did in fact renew its deliberations. And the jury acquitted Beaulieu of two counts, suggesting it fairly and thoroughly evaluated the trial evidence.[18]

This case is somewhat unique in that two alternates were substituted at the same time, which diminished the risk of coercion. Proceeding with a jury of 12 with two new jurors also theoretically decreased the chances of conviction. Guevara, 823 F.2d at 448 ("A criminal defendant quite reasonably may prefer to have his fate decided by a jury of twelve rather than a smaller group of eleven. The additional juror is one more person whom the government must convince beyond a reasonable doubt of the defendant's guilt.") Here, there were two more jurors who had to be convinced by the government's evidence. Under the totality of the circumstances, we conclude that the district court did not abuse its discretion in replacing Juror 11 with an alternate juror.

## VI.  MOTION TO SEVER

Oscar appeals the district court's denial of his motion to sever his trial from that of Beaulieu and Dalpe.

---

[18]We do point out that the district court could have ordered that all juror notes compiled during prior deliberations be confiscated. While that is good practice, we cannot say that it is required.

35

## A.    Background

On May 27, 2014, approximately a week before his trial, Oscar filed a

motion to sever his trial from that of his co-defendants, which the district court

denied.  In its order, the district court explained (1) that Oscar did not establish

prejudice because his crimes arose out of "a single string of controlled transactions

all comprising a single investigation," (2) that the case "[was] not particularly

complex," and thus the jury was not likely to misapply evidence to the wrong

defendant, and (3) that any purported prejudice could be mitigated by a cautionary

instruction to the jury.

During trial, Oscar renewed his severance motion twice, arguing that he was

prejudiced because Beaulieu and Dalpe had confessed to their crimes whereas he

had not.  The district court denied both motions.

## B.    Compelling Prejudice Standard

The general rule is to try defendants indicted together in the same trial.

United States v. Lopez, 649 F.3d 1222, 1234 (11th Cir. 2011); United States v.

Cassano, 132 F.3d 646, 651 (11th Cir. 1998).  However, a severance under Rule 14

may be granted if a defendant can demonstrate that a joint trial will result in

"specific and compelling prejudice" to his or her defense.  United States v. Liss,

265 F.3d 1220, 1228 (11th Cir. 2001) (discussing Federal Rule of Criminal

36

Procedure 14); see also United States v. Eyster, 948 F.2d 1196, 1214 (11th Cir. 1991).

This is a heavy burden. "Compelling prejudice" requires a defendant to establish that a joint trial "would actually prejudice the defendant and that a severance is the only proper remedy for that prejudice—jury instructions or some other remedy short of severance will not work." Lopez, 649 F.3d at 1234. The defendant must show that a jury will be unable, due to the complex nature of the evidence, to make a reliable determination of guilt for each defendant. Id. at 1235. The mere fact that there may be an enormous disparity in the evidence admissible against one defendant compared to the other defendants is not a sufficient basis for reversal. United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997).

"A defendant does not suffer compelling prejudice, sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants." Id. (quotation marks omitted). Conclusory allegations of spillover prejudice will not satisfy this heavy burden. United States v. Francis, 131 F.3d 1452, 1459 (11th Cir. 1997). In other words, the "potential for prejudice from a joint trial is not enough." Lopez, 649 F.3d at 1234, 1236-41 (determining that defendants charged with drug trafficking had not established compelling prejudice due to joinder with co-defendants charged for capital murder); United States v. Knowles, 66 F.3d 1146, 1158-60 (11th Cir. 1995). Further, where the district court

37

gives a curative instruction to address prejudicial evidence, this Court will reverse only where the evidence was so highly prejudicial that it could not be cured by the district court's admonition. United States v. Funt, 896 F.2d 1288, 1295-96 (11th Cir. 1990).

## C.    Analysis

Here, the district court did not abuse its discretion in denying Oscar's motion for severance. As the trial evidence demonstrated, the defendants shared a criminal network. Indeed, Oscar benefited from this network, using Saintonas' connection to the UA to make his gun sales.

Any potential spillover effect of the drug sales was substantially mitigated by the UA's testimony that Oscar never tried to sell him drugs. Any concerns that the evidence against Beaulieu would prejudice Oscar's defense were also mitigated by the district court's two cautionary instructions to the jury. Lopez, 649 F.3d at 1235 (reiterating that a district court's cautionary instructions to the jury "ordinarily will mitigate the potential 'spillover effect' of evidence of a co-defendant's guilt" (quoting United States v. Kennard, 472 F.3d 851, 859 (11th Cir. 2006))). The district court gave the first instruction before an expert witness testified about the connection between drug sales and guns. The district court instructed the jury as follows:

> [W]e are having one trial because a lot of the witnesses' testimony relates to more than one defendant, sometimes all three defendants,

38

and so rather than have three sets of jurors listening to this and have the witnesses come in two or three times, we try the cases together for the convenience of everybody.

But there really are three separate trials going on and part of the instructions is your verdict as to one defendant should not affect your verdict as to any of the other defendants in this case.

So as to this particular witness, his testimony is only admissible against the defendant Hypico Beaulieu. I am not telling you to accept his testimony, that you have to use it against Mr. Beaulieu, but I am just saying you can't consider it against the other defendants. It is only admissible for whatever value you think it has as to Mr. Beaulieu.

Then before jury deliberations, the district court instructed the jury to consider each crime and each defendant "separately and individually," as follows:

Each count of the superseding Indictment charges a separate crime against one of the defendants. You must consider each crime and the evidence relating to it separately. And you must consider the case of each defendant separately and individually. If you find a defendant guilty of one crime, that must not affect your verdict for any other crime or any other defendant.

I caution you that each defendant is on trial only for the specific crimes charged in the superseding Indictment. You are here to determine from the evidence in this case whether each defendant is guilty or not guilty of those specific crimes.

Indeed, the jury convicted Beaulieu of some crimes, but not others, evidencing individual examination of each crime. Given the UA's testimony and these two instructions, Oscar has not met his heavy burden to show specific and compelling prejudice.

39

## VII.  BEAULIEU'S SENTENCE

Beaulieu appeals his sentence imposed under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e).[19]

### A.    Presentence Report and Sentencing

The Presentence Report ("PSR") calculated that Beaulieu had an adjusted offense level of 30 without the ACCA increase, consisting of (1) a base offense level of 24 under U.S.S.G. § 2K2.1(a)(2) because Beaulieu had at least two prior felony convictions for a crime of violence or controlled substance offense; (2) a two-level increase under § 2K2.1(b)(4)(A) because the firearm was stolen; and (3) a four-level increase under § 2K2.1(b)(6)(B) because Beaulieu possessed the firearm in connection with another felony.  Beaulieu had 10 criminal history points, yielding a criminal history category of V.  The district court sustained Beaulieu's objection to the four-level increase under § 2K2.1(b)(6)(B), but overruled his objection to the two-level increase for the stolen firearm.[20]  That made Beaulieu's offense level 26.  The PSR also noted that Beaulieu was a career

---

[19]This Court reviews de novo the district court's interpretation of the Sentencing Guidelines and its application of the Guidelines to the facts.  United States v. Moran, 778 F.3d 942, 959 (11th Cir. 2015).  When timely objections are made in the district court, we review de novo whether a prior conviction qualifies as a predicate offense under the ACCA.  United States v. Green, 873 F.3d 846, 869 (11th Cir. 2017).

[20]The firearm retrieved from Beaulieu's bedroom during his arrest had been reported stolen during a residential burglary in Coral Gables, Florida in 2011.

offender under § 4B1.1(a), which increased his offense level to 32.  On appeal, Beaulieu has not challenged these calculations.

However, the PSR and the district court also determined that Beaulieu was an armed career criminal based on three prior convictions for violent felonies, with one being his conviction for Florida burglary under Florida Statute § 810.02.  This increased Beaulieu's total offense level to 33.  Beaulieu's criminal history category of V, combined with his total offense level of 33, resulted in an advisory guidelines range of 210 to 262 months of imprisonment.

During the October 3, 2014 sentencing hearing, Beaulieu argued that his Florida burglary conviction was not a violent felony under the ACCA and thus that he did not have the three required predicate offenses.  The district court disagreed under the applicable precedent at the time.  The district court sentenced Beaulieu to 210 months' imprisonment on Counts One, Three, Four, Six, and Eight, and 120 months' imprisonment on Count Five, all to run concurrently.

## B.    **Johnson** and **Esprit**

Under the ACCA, a felon who is convicted of illegally possessing a firearm and has at least three prior convictions for a "violent felony" or "serious drug offense" receives a mandatory minimum sentence of 15 years' imprisonment.  18 U.S.C. § 924(e)(1).  The ACCA defines a "violent felony" as any crime punishable by a term of imprisonment exceeding one year that:

41

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

Id. § 924(e)(2)(B).

The first prong of this definition is sometimes referred to as the "elements clause," while the second prong contains the "enumerated crimes clause" and what is commonly called the "residual clause." United States v. Owens, 672 F.3d 966, 968 (11th Cir. 2012). In Johnson v. United States, the Supreme Court held that the ACCA's residual clause is unconstitutionally vague, but did not call into question the ACCA's elements clause or the enumerated crimes clause. See Johnson v. United States, 576 U.S. ___, 135 S. Ct. 2551, 2557-58, 2563 (2015).

Subsequently, this Court held that a Florida burglary conviction under Florida Statute §§ 810.02(1)(b)(1) and 810.011(2) no longer constitutes a violent felony under the ACCA. United States v. Esprit, 841 F.3d 1235, 1241 (11th Cir. 2016). More specifically, in Esprit, this Court held that a Florida burglary conviction under Florida Statute §§ 810.02(1)(b)(1) and 810.011(2) cannot serve as an ACCA predicate offense under the enumerated offense clause and "indisputably does not implicate the elements clause." Id. at 1237, 1240-41.

Thus, after Johnson and Esprit, Beaulieu's particular Florida burglary conviction does not count for the purposes of the ACCA. And even looking at all

42

of the other convictions listed in the PSR, we conclude that Beaulieu has only two prior convictions that qualify as violent felonies. We vacate Beaulieu's sentence because he is not subject to the ACCA's enhanced penalties and is not an armed career criminal as defined under U.S.S.G. § 4B1.4(a).

## VIII. CONCLUSION

For all of the above reasons, we affirm Oscar's and Beaulieu's convictions. However, under <u>Johnson</u> and <u>Esprit</u>, we vacate Beaulieu's sentence on Count Eight and remand to the district court to resentence him without the ACCA enhancement.[21]

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**

---

[21]On appeal Beaulieu advances an ineffective-assistance-of-counsel claim, citing his trial counsel's failure to file a motion to suppress. Beaulieu argues that the statements he made to federal law enforcement officers on April 11, 2013—the day he orchestrated the ruse to rob the UA of $2,300—were elicited from him in violation of his Fifth Amendment rights. Beaulieu further contends that the search of his residence, and the resulting seizure of the money from the robbery, violated his Fourth Amendment rights because his consent to the search was not voluntary.

Because the record is not developed on this claim, we will not address it on direct appeal. <u>United States v. Bender</u>, 290 F.3d 1279, 1284 (11th Cir. 2002) ("We will not generally consider claims of ineffective assistance of counsel on direct appeal where the district court did not entertain the claim nor develop a factual record.").